# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARVA A.,              :
                                :
      **Plaintiff,**         :
                                  :
      **v.**                 :       **CIVIL ACTION FILE NO.**
                                  :       **1:17-cv-02385-AJB**
**COMMISSIONER, SOCIAL**   :
**SECURITY ADMINISTRATION,** :
                                  :
      **Defendant.**      :

## O R D E R  A N D  O P I N I O N[1]

Plaintiff Marva A. ("Plaintiff") brought this action pursuant to sections 205(g)

and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain

judicial review of the final decision of the Commissioner of the Social Security

Administration ("the Commissioner") denying her application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 11/16/2017 & 11/17/2017). Therefore, this Order constitutes a final Order of the Court.

Security Act.[2]  For the reasons below, the undersigned **AFFIRMS** the final decision of

the Commissioner.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on July 16, 2012, alleging disability

commencing on August 1, 2011.  [Record (hereinafter "R") 369-78].  Plaintiff's

applications were denied initially and on reconsideration.  [*See* R185-286].  Plaintiff

then requested a hearing before an Administrative Law Judge ("ALJ").  [R290-91].  An

evidentiary hearing was held on June 17, 2014.  [R163-84].  During the hearing, the

ALJ announced that he wanted to send Plaintiff for consultative examinations.  [R183].

After the additional medical evidence was entered into the record, the ALJ held a

---

[2]        Title II of the Social Security Act provides for DIB.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for SSI benefits for the disabled.  SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  In general, the legal standards to be applied are also the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

AO 72A
(Rev.8/8
2)

second evidentiary hearing on June 30, 2015. [R136-62]. On July 6, 2015, the ALJ ordered a Cooperative Disability Investigation ("CDI"), and the resulting report, dated November 5, 2015, was later entered into the record by the ALJ. [R1186-1205]. The ALJ issued a decision on April 22, 2016, denying Plaintiff's application on the ground that she had not been under a "disability" within the context of the Social Security Act from the alleged onset date through the date of the decision. [R98-126]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on May 4, 2017, making the ALJ's decision the final decision of the Commissioner. [R1-7].

Plaintiff then filed this action on June 26, 2017, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on October 18, 2017. [*See* Docs. 6, 7]. On November 20, 2017, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 9]; on December 20, 2017, the Commissioner filed a response brief in support of the decision, [Doc. 10]; on January 2, 2018, Plaintiff filed a reply brief in support of her petition for review, [Doc. 11]; and on January 25, 2018, the Commissioner filed a response to

Plaintiff's reply brief, [Doc. 13-1].[3]  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[4] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

---

[3]      When Plaintiff did not object to the Commissioner's motion to file the response to her reply brief, (*see* Dkt.), the Court granted the motion as unopposed, [Doc. 14].

[4]      Neither party requested oral argument.  (*See* Dkt.).

AO 72A
(Rev.8/8
2)

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five,

AO 72A
(Rev.8/8
2)

the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

## III. SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as

7

a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

AO 72A
(Rev.8/8
2)

## IV. STATEMENT OF FACTS[5]

### A. *Background*

Plaintiff was thirty-eight years old at her alleged disability onset and forty-three years old when the ALJ decision issued. [R119, 369]. She can read and write, has a general equivalency diploma, and previously worked as a certified nursing assistant, cook, day care provider, and home health aide. [R410-12]. Plaintiff alleges that she is unable to work due to depression, anxiety attacks, two strokes with memory loss, a heart murmur caused by high blood pressure, migraines with partial paralysis, and a hernia. [R411, 445-46, 451-52].

### B. *Lay Testimony*

In her hearings before the ALJ, Plaintiff reported that because of her anxiety and depression, she did not come out of her room, leave home often, or drive; she got confused and afraid about directions; she lashed out frequently; she did not go around people; and she did not like to talk to people. [R152, 154, 176, 182].

---

[5] In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 9-11; Doc. 13-1; *see also* Doc. 8 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")].

AO 72A
(Rev.8/8
2)

## C. Medical Records

On July 23, 2007, Plaintiff underwent a psychological consultative examination with David B. Rush, Ph.D. [R1042-45]. On examination, Dr. Rush observed that Plaintiff's memory appeared intact, she demonstrated ability to solve simple calculations, her motor activity was within normal limits, her insight and judgment were fair, she exhibited no delusions or hallucinations during the evaluation, she appeared focused and alert, her attention and concentration were good, she worked consistently throughout the testing process and seemed to put forth good effort, and rapport was easily established, and Dr. Rush stated that he believed the testing results were a valid reflection of Plaintiff's current level of functioning. [R1044]. He determined that Plaintiff had a full-scale IQ of 77, and he diagnosed major depressive disorder, single episode, mild; panic disorder without agoraphobia; borderline intellectual functioning; and migraine headaches. [R1044-45]. He also opined that Plaintiff could understand and remember short, simple instructions, could perform routine tasks in environments of minimal stress, appeared capable of performing tasks independently, and could handle supervision and getting along with others, but that she would benefit from performing tasks out of the vicinity of others. [R1045]. Dr. Rush further opined that due to fatigue, Plaintiff might exhibit difficulty managing a routine

10

schedule and demonstrating reliability. [R1045]. He also recommended that Plaintiff continue medication to manage her emotional symptoms and procure counseling to assist her with learning to cope with anxiety and depression. [R1045]. He also stated that her prognosis was favorable, contingent on her ability and willingness to comply with a prescribed course of treatment. [R1045].

Plaintiff began receiving psychiatric treatment from Aly Ahmed, M.D., on August 7, 2012. [R826]. She reported that she was depressed, anxious, and sad, and that she had sleep disturbance, excessive worries, and loss of energy and interest. [R826]. Dr. Ahmed diagnosed major depression and prescribed Celexa,[6] Xanax,[7] and trazodone.[8] [R826].

Plaintiff returned to Dr. Ahmed on August 21, 2012. [R825]. Plaintiff reported that she could not sleep at all without medication, that she tolerated the medication

_____

[6]     Celexa (citalopram) is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. MedlinePlus, Citalopram, https://medlineplus.gov/druginfo/meds/a699001.html (last visited 9/10/18).

[7]     Xanax (alprazolam) is a benzodiazepine typically used to treat anxiety disorders and panic disorder. Medline Plus, Alprazolam, https://medlineplus.gov/druginfo/meds/a684001.html (last visited 9/10/18).

[8]     Trazodone is a serotonin modulator typically used to treat depression. MedlinePlus, Trazodone, https://medlineplus.gov/druginfo/meds/a681038.html (last visited 9/10/18).

AO 72A
(Rev.8/8
2)

well, and that she had no side effects. [R825]. Dr. Ahmed noted that she had a sad mood with congruent and anxious affect; was alert and oriented; had clear and coherent speech, an organized thought process, and good concentration; wore appropriate clothing; and had an energy level within normal limits. [R825]. Dr. Ahmed increased Plaintiff's medication and referred her to a therapist. [R825].

Plaintiff returned to Dr. Ahmed on September 4, 2012. [R824]. Dr. Ahmed noted that she was alert, oriented, and wore appropriate clothing; that she had a decreased energy level; and that her appetite and sleep were poor due to depression. [R824]. Dr. Ahmed diagnosed major depressive disorder; noted that Plaintiff needed help working through cognitive distortion (all or none, magnification, and catastrophizing); and increased her trazodone and Celexa. [R824].

Plaintiff returned to Dr. Ahmed on October 2, 2012. [R823]. She indicated that she was tolerating medication well, was not experiencing any side effects, and was experiencing limited improvement with the increase in her medication. [R823]. Dr. Ahmed noted that she had a sad mood with a sad, tearful, and anxious affect; was alert and oriented; had clear and coherent speech, an organized thought process, and good concentration; wore appropriate clothing; and had an energy level within normal limits. [R823]. Dr. Ahmed noted that Plaintiff needed help working through cognitive

12

distortion (all or none), continued her medication, and referred her to a therapist. [R823].

On October 8, 2012, Plaintiff saw her primary care physician for neck and arm pain. [R673]. She reported that her depression and anxiety were better with psychiatric treatment. [R673]. On examination, Plaintiff was noted to be fully oriented, with intact memory and normal mood, affect, judgment, and insight. [R675].

Plaintiff underwent a psychological consultative examination with Melanie M. Echols, Ph.D., on October 22, 2012. [R1046-51]. Dr. Echols noted Plaintiff's reported history of strokes and childhood abuse. [R1047-48]. She diagnosed anxiety disorder; physical abuse of an adult, by history; and rule-out cannabis abuse. [R1050-51]. She found that Plaintiff had an intact memory and that she was capable of simple, routine tasks but would have problems coping with significant amounts of stress. [R1050-51]. She stated that Plaintiff's motivation throughout the evaluation was sufficient, the information obtained was consistent across interviews and with Plaintiff's presentation, and she was therefore of the opinion that the results of the evaluation were valid. [R1051].

Plaintiff returned to Dr. Ahmed on November 20, 2012. [R821]. Plaintiff reported that she was tolerating medication well, was not experiencing any side effects,

13

and was experiencing limited improvement with medication. [R821]. She also indicated that she was experiencing an increase in stressors: she had received an eviction notice, and her son was in legal trouble. [R821]. Dr. Ahmed noted that she had a sad mood with a sad, emotional, and anxious affect; was alert and oriented; had clear and coherent speech, an organized thought process, and good concentration; wore appropriate clothing; and had an energy level within normal limits. [R821]. Dr. Ahmed also remarked that Plaintiff remained depressed and anxious, that she had attended only one counseling session, and that she needed help working through cognitive distortion (all or none). [R821]. He prescribed Tegretol,[9] continued Celexa and Xanax, and increased trazodone. [R821].

On March 6, 2013, state agency reviewing physician Robbie Ronin, Psy.D., completed a Psychiatric Review Technique ("PRT") and a mental RFC assessment. [R242-48]. Dr. Ronin opined that Plaintiff had severe anxiety disorders, organic mental disorders, and substance addiction disorders; that she had moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, and

---

[9] Tegretol (carbamazepine) is an anticonvulsant medication commonly used to control seizures, treat nerve pain, and treat episodes of mania or mixed episodes in patients with bipolar I disorder. It is also sometimes used to treat depression and post-traumatic stress disorder. MedlinePlus, Carbamazepine, https://medlineplus.gov/druginfo/meds/a682237.html (last visited 9/10/18).

AO 72A
(Rev.8/8
2)

moderate difficulties in maintaining concentration, persistence, or pace; and that she had no repeated extended episodes of decompensation. [R242]. Dr. Ronin further opined that Plaintiff had a moderate, but not substantial, limitation in her ability to understand, remember, and carry out detailed instructions; could perform simple tasks and focus for up to two hours at a time; had adequate concentration for basic activities; had a moderate, but not substantial, limitation in her ability to sustain concentration for extended periods; would be able to maintain basic social interactions; would have some problems responding appropriately to criticism from supervisors and relating to coworkers, but would be able to handle it well enough to function on a job; and would have occasional limitation in her ability to interact with the general public, although the limitation was not substantial. [R245-48].

Optometrist records from an examination taking place on March 19, 2013, reflect diagnoses of dry-eye syndrome, myopia, astigmatism, and suspected hypertension. [R1052-53]. Plaintiff was prescribed artificial tears, as needed. [R1053].

Plaintiff returned to care with Dr. Ahmed on April 9, 2013. [R819]. She reported that she was not doing very well and had been out of medication for months.

[R819].  She was observed to have a dysphoric[10] mood, slow speech, and a constricted affect, but intact memory, good eye contact, and fair concentration, insight, judgment, and cognition.  [R820].  Dr. Ahmed resumed Plaintiff's prescriptions for Tegretol, Celexa, trazodone, and Xanax.  [R820].

Plaintiff returned to Dr. Ahmed on June 18, 2013.  [R817].  She reported that her son's fiancée had been killed in a car accident and that her son and his three-year-old child were living with her.  [R817].  Dr. Ahmed diagnosed major depressive disorder, severe, recurrent, and anxiety, and he increased Plaintiff's Xanax and Celexa. [R817-18].

Plaintiff next returned to care with Dr. Ahmed on January 10, 2014.  [R815].  It was noted that Plaintiff had been off medication but that her primary care physician had given her prescriptions for Prozac,[11] Xanax, and trazodone on December 19.  [R815]. Dr. Ahmed noted that Plaintiff's mood was anxious and depressed, but her speech was regular, and her concentration, memory, insight, judgment, and cognition remained fair.

---

[10]    Dysphoria refers to a mood of general dissatisfaction, restlessness, depression, and anxiety, or a feeling of unpleasantness or discomfort.  *PDR Med. Dictionary* 534 (1st ed. 1995).

[11]    Prozac (fluoxetine) is an SSRI used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. MedlinePlus, Fluoxetine, https://medlineplus.gov/druginfo/meds/a689006.html (last visited 9/10/18).

AO 72A
(Rev.8/8
2)

[R816]. Dr. Ahmed decreased Plaintiff's Xanax, continued her Prozac, increased her trazodone, and referred her for therapy. [R816].

At a gynecological appointment taking place on January 27, 2014, Plaintiff denied depression, anxiety, or difficulty concentrating, and her gynecologist noted appropriate affect, normal mood and speech, logical thought, and intact reasoning. [R897-99].

At a primary care visit taking place on May 1, 2014, Plaintiff was seen for follow up of complaints of chest pain. [R989]. She was also noted to complain of having uncontrolled hypertension, of having been out of anxiety medication for one month, and of having menopausal symptoms. [R989]. She had no psychiatric complaints and was observed to be fully oriented, have intact memory, judgment, and insight, and to have normal mood and affect. [R989, 991].

Plaintiff returned to Dr. Ahmed on May 29, 2014. [R1026]. He observed that Plaintiff's thought process was circumstantial, her thought content was paranoid, her affect was hyperanimated, her concentration, sleep, and appetite were poor, and her memory, insight, judgment, family relations, eye contact, hygiene, and cognition were fair; diagnosed anxiety, depression, and mood disorder; and restarted medication. [R1027].

17

Plaintiff next saw Dr. Ahmed on July 8, 2014. [R1024]. Plaintiff complained of shoulder and chest pain as well as disturbed sleep and appetite, loss of interest, hopelessness, helplessness, and distractibility. [R1024]. Dr. Ahmed indicated that Plaintiff had dysphoric mood, withdrawn behavior, circumstantial thought process, fair to poor social interaction, constricted affect, and paranoid thought content, and was distracted, but that she also had fair memory, eye contact, hygiene, insight, judgment, and cognition. [R1025]. Dr. Ahmed increased Plaintiff's Prozac; continued her Xanax and tramadol; and referred her for supportive therapy and anger management. [R1025].

Plaintiff underwent a psychological consultative examination with Ralph Allsopp, Ph.D., on July 15, 2014. [R978-85]. Dr. Allsopp indicated that he had received a copy of the 2012 evaluation by Dr. Echols and that Plaintiff had described to Dr. Echols physical and mental health problems similar to those she reported to him, although there were mild inconsistencies in Plaintiff's accounts of dates and details of events, and her report to Dr. Allsopp that she had not used cannabis conflicted with her admission to Dr. Echols that she had used it four times. [R981]. He also noted that Plaintiff reported that she did not currently have any friends and that, while she is able to get along with others superficially and for short periods of time, she had a history of problems working with others due to mood swings. [R983].

18

AO 72A
(Rev.8/8
2)

Dr. Allsopp indicated that Plaintiff was cooperative and alert during the evaluation, she made eye contact, and rapport was easily established. [R983]. He also stated that because the information she reported was generally consistent across the collateral interview, collateral documentation, and behavioral observations, and the inconsistencies were minimal and did not appear to be attempts at being deceptive or unreliable, he found her to be a reliable informant. [R985].

Dr. Allsopp provisionally diagnosed major depressive disorder, recurrent, moderate, and cognitive disorder. [R985]. He opined that Plaintiff was oriented, with goal-directed, logical, and coherent thoughts and fair abstract reasoning; had no problems with basic judgment or decision-making; was able to concentrate on simple tasks; and could understand basic information and instructions. [R984-85]. He also opined that her sleep problems had the potential to interfere with her ability to follow a work schedule and that her limited frustration tolerance might cause her to have difficulty getting along with others in stressful situations. [R985]. In a standard Social Security Medical Source Statement, Dr. Allsopp opined that Plaintiff's limitations included a "marked" limitation in the ability to interact appropriately with supervisors and coworkers and in the ability to respond appropriately to usual work situations and changes in a routine setting. [R979].

19

AO 72A
(Rev.8/8
2)

Plaintiff underwent a physical consultative examination with Alicia Cain, M.D., on July 28, 2014. [R993-1009]. Dr. Cain observed that Plaintiff "was somewhat of a poor historian." [R998]. She also noted that Plaintiff was wearing a neck brace and had her right arm in a sling, that Plaintiff reported having had a slip-and-fall injury in 2010 involving an injured right rotator cuff, and that Plaintiff reported that she had worn the neck brace since she was diagnosed with a hemivertebra[12] at C4 in 2010 but had not had physical therapy or musculoskeletal surgery. [R998]. On examination, Plaintiff's blood pressure was markedly elevated at 158/107; she had a slow, cautious gait; she was unable to pick up small objects from the table with her right hand; and her grip strength was reduced to 3/5 on the right. [R996, 999].

Dr. Cain diagnosed hypertension with a history of a heart attack (MI) and a history of stroke (CVA); asthma and migraines by history; and chronic musculoskeletal pain. [R999]. Dr. Cain also opined that Plaintiff could only lift up to ten pounds occasionally; could sit, stand, or walk for a total of three hours each during an eight-hour day; would never be able to finger, feel, push, or pull with the right hand; and could only occasionally finger, feel, push, or pull with the left hand. [R1000-02].

_____

[12]     A hemivertebra is a congenital defect of the spine in which one side of a vertebra fails to develop completely. *PDR Med. Dictionary* 776 (1st ed. 1995).

20

AO 72A
(Rev.8/8
2)

Plaintiff underwent a neurological consultative examination with Raghuram Kolanu, M.D., on September 3, 2014. [R1010-22]. It was noted that Plaintiff's blood pressure was markedly elevated at 180/120. [R1021-22]. In the assessment, Dr. Kolanu repeatedly indicated that Plaintiff had weakness in her right arm and difficulty using her right arm. [R1012-14]. In the neurological questionnaire, however, Dr. Kolanu stated that Plaintiff had 4+/5 strength in the right hand and right upper extremity but was not able to use the right hand to write. [R1017-18]. He also noted that there was pain on any movement of the right arm and upon any attempt to move the neck; that it was difficult to assess Plaintiff's deficits due to the pain; and that the cause of the pain was not clear. [R1020-22]. He also stated that Plaintiff might have accurately reported that in the past she had suffered a stroke. [R1022]. Dr. Kolanu additionally opined that Plaintiff was limited to only occasionally lifting and carrying up to ten pounds; could sit for eight hours; could stand and walk for a total of two hours; and could only occasionally use her right hand for fingering, feeling, pushing, or pulling. [R1011-12].

On September 4, 2014, Plaintiff presented to the Piedmont Healthcare emergency department with complaints of right-arm and neck pain that she stated was chronic, caused by a nerve injury, and made worse during a visit to her neurologist the previous

AO 72A
(Rev.8/8
2)

day. [R1095-96]. She also reported a history of anxiety, depression, and post-traumatic stress disorder. [R1097]. Upon examination, Plaintiff exhibited tenderness in the right upper arm, a cranial nerve deficit was noted to be present, and it was observed that Plaintiff had a normal mood, affect, and behavior. [R1098]. Her blood pressure reading was 192/107. [R1097]. She was diagnosed with cervical radiculopathy,[13] hypertension, and chronic neck pain. [R1099].

At an appointment with Dr. Ahmed taking place on October 14, 2014, Plaintiff stated that she was feeling okay but that pain was causing her a lot of stress and she felt that the Xanax was not working. [R1104]. Notes indicate that Plaintiff demonstrated good cognition, eye contact, and social functioning; euthymic[14] mood; fair insight, judgment, memory, and family functioning; and poor concentration and sleep.

---

[13] Radiculopathy is an alternate name for a herniated (slipped) disk, which occurs when all or part of the softer center of a spinal disk is forced through a weakened part of the exterior of the disk, forming a protruding mass and placing pressure on nearby nerves. Mayo Clinic, Herniated Disk, https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095 (last visited 9/10/18); MedlinePlus, Herniated Disk, https://medlineplus.gov/ency/article/000442.htm (last visited 9/10/18); J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* H-115 (46th ed. 2012).

[14] "Euthymic" relates to a moderate mood—"not manic or depressed." *PDR Med. Dictionary* 606 (1st ed. 1995).

AO 72A
(Rev.8/82)

[R1104-05]. Dr. Ahmed continued Prozac and trazodone and discontinued Xanax. [R1105].

Notes from an optometrist examination taking place on November 4, 2014, show that Plaintiff's blood pressure was so elevated (184/120) that she was referred to the emergency room for urgent care. [R1054-55]. She was diagnosed with malignant hypertension and ischemic optic neuropathy.[15] [R1055].

Plaintiff presented to the Piedmont Healthcare emergency department on November 5, 2014, with complaints of hypertension and chest pain. [R1070-71]. She described the pain as throbbing and mild. [R1071]. Blood-pressure readings taken during admission were as great as 145/98 and were eventually reduced to 117/86. [R1073]. Plaintiff was diagnosed with uncontrolled hypertension and discharged as stable. [R1076].

On December 8, 2014, neurologist Ronald DeVere, M.D., reviewed the record and completed a report and answers to interrogatories regarding Plaintiff's physical impairments. [R1028-38]. While he found that the reports did not indicate that

---

[15] Ischemic optic neuropathy is damage of the optic nerve caused by a blockage of its blood supply. Merck Manual, Ischemic Optic Neuropathy, https://www.merckmanuals.com/home/eye-disorders/optic-nerve-disorders/ischemic-optic-neuropathy (last visited 9/10/18).

AO 72A
(Rev.8/8
2)

Plaintiff had any stroke residuals or neurological abnormality, he agreed with the functional limitations the consultative examiners set forth based upon Plaintiff's right-arm pain and use of a sling. [R1029, 1031]. He also opined that Plaintiff was limited to lifting and carrying up to ten pounds occasionally; could sit for a total of six hours; could stand and walk three hours each; could never use her right hand for reaching, handling, pushing, or pulling; and could only use the right hand occasionally for fingering and feeling. [R1033-35].

Plaintiff presented to the Piedmont Healthcare emergency department on January 27, 2015, with complaints of right-arm and right-leg pain. [R1062-63]. Plaintiff was observed to be well-oriented and tearful. [R1064]. Her blood pressure was 137/92. [R1064]. No swelling was noted in the right arm and leg, and strength was intact. [R1065]. The impression given was chronic arm and leg pain and anxiety. [R1065].

Plaintiff presented to the Piedmont Healthcare emergency department on March 2, 2015. [R1056]. Her blood pressure was 195/119. [R1057]. She was diagnosed with anxiety state, unspecified, and unspecified essential hypertension. [R1059].

AO 72A
(Rev.8/8
2)

During an appointment with Dr. Ahmed taking place on March 24, 2015, Plaintiff reported that she was feeling better and that her mood and sleep had improved, although she reported hearing voices. [R1101]. Dr. Ahmed noted that Plaintiff was fully oriented; her speech was soft; her mood was anxious and dysphoric; her behavior was cooperative; her thought process was organized; her affect was flat; the content of her thoughts was relevant; her memory, concentration, cognition, insight, and judgment were fair; and her depression, anxiety, and insomnia were improving. [R1101-02]. He continued Plaintiff on medication. [R1102].

On April 27, 2015, Plaintiff presented to Atlanta Heart Associates, P.C., for follow-up of atherosclerosis[16] and hypertension. [R1112]. She also reported having recurring right-leg pain with swelling and having recently had chest pain and shortness of breath. [R1112]. Her blood pressure reading was 148/88. [R1113]. The cardiologist noted right-leg pain with redness and swelling, normal muscle strength and tone, and appropriate mood, memory, and judgment. [R1113]. He also found that the

---

[16]    Atherosclerosis is characterized by irregularly distributed lipid deposits in the innermost portions of large and medium-sized arteries. The deposits block blood flow. *PDR Med. Dictionary* 162 (1st ed. 1995).

25

AO 72A
(Rev.8/8
2)

atherosclerosis and hypertension were stable and advised NSAID drugs[17] and warm compresses for the right-leg pain. [R1113].

Plaintiff also saw Dr. Ahmed on April 27, 2015. [R1155]. Notes indicate that she complained of feeling aggravated because of hot flashes and pain in her right leg. [R1155]. Dr. Ahmed noted that Plaintiff had poor eye contact, dysphoric mood, flat affect, and withdrawn behavior, but she had clear speech, organized thought process with relevant content, good cognition, fair concentration, insight, judgment, social functioning, appetite, and sleep, and intact memory. [R1155-56].

Plaintiff returned to Dr. Ahmed on May 27, 2015. [R1153]. She again complained of feeling aggravated because of hot flashes and pain as well as disturbed sleep. [R1153]. Dr. Ahmed found that Plaintiff had a depressed and irritable mood and a flat affect, but she had clear speech, good eye contact, cooperative behavior, organized thought process with relevant content, and fair memory, concentration, cognition, insight, judgment, and social functioning. [R1153-54]. He diagnosed major

---

[17] Nonsteroidal anti-inflammatory drugs ("NSAIDs") are some of the most commonly used pain medicines in adults. They can also decrease inflammation. Traditional NSAIDs include aspirin, ibuprofen, and naproxen. Am. Coll. of Rheumatology, NSAIDs (nonsteroidal anti-inflammatory drugs), https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/NSAIDs (last visited 9/10/18).

AO 72A (Rev.8/82)

depressive disorder; increased amitriptyline[18]; continued Xanax, Prozac, and depakote[19]; and continued Plaintiff's referral to therapy. [R1154].

Dr. Ahmed completed a Medical Assessment of Ability to Sustain Work-Related Activities (Mental) on May 28, 2015. [R1182-85]. Dr. Ahmed opined that Plaintiff had chronic severe depression, anxiety, and mood swings, and that over the course of an eight-hour workday, she could only make occupational, performance, and personal-social adjustments twenty to forty percent of the time. [R1183-85]. He further opined that Plaintiff's impairments prevented her from working full-time because she was unpredictable and irrational due to severe depression and anxiety, especially under stress. [R1185]. He also checked a box indicating that she met listing 12.04, Affective Disorders. [R1185].

---

[18] Amitriptyline is a tricyclic antidepressant. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. MedlinePlus, Amitriptyline, https://medlineplus.gov/druginfo/meds/a682388.html (last visited 9/10/18).

[19] Depakote (valproic acid) is used to treat certain types of seizures, to prevent migraine headaches, and to treat mania in people with bipolar disorder. MedlinePlus, Valproic Acid, https://medlineplus.gov/druginfo/meds/a682412.html (last visited 9/10/18).

AO 72A
(Rev.8/8
2)

On July 7, 2015, Plaintiff visited her primary care physician with complaints of a migraine, a sore throat, and concerns about weight gain. [R1213]. A nurse noted normal mood and affect, with intact memory, judgment, and insight. [R1215].

### D. Cooperative Disability Investigation

The CDI summary report resulting from the investigation the ALJ ordered after the second hearing stated that Georgia Bureau of Investigation agent Jonathan Spurlock discovered Plaintiff's Facebook accounts, and on September 10, 2015, he met with Plaintiff for fifteen minutes on her front porch. [R1189-91]. One of Plaintiff's Facebook accounts had 530 friends and another had 2,478 friends. [R1189]. Agent Spurlock found that Plaintiff was friendly; she laughed appropriately at times during the conversation; she did not appear to be depressed, anxious, groggy, or confused; she was able to recall her cell phone number; she was able tell the investigator where certain residents of a particular race lived and name the streets in the area; and she was alert to her grandson's need to take a certain schoolbook with him. [R1190-91]. Plaintiff was using both hands to access and type information into Facebook on her cell phone. [R1191].

Agent Spurlock also interviewed two unnamed witnesses in a store where Plaintiff shopped. [R1191]. The witnesses indicated that Plaintiff came into the store

28

AO 72A
(Rev.8/8
2)

once or twice a week, usually by herself; seemed friendly; did not display any strange or unusual behavior; did not need any special assistance; and shopped like any other customer. [R1191-92].

### E. Vocational-Expert Testimony

A vocational expert ("VE") testified at the hearing before the ALJ. [R155-61]. He testified that if a person of Plaintiff's age, education, and work experience was limited, as stated in Dr. DeVere's opinion, to lifting up to ten pounds occasionally; sitting for a total of six hours per workday, but only two hours at a time; standing for a total of three hours per workday for one hour at a time; and walking for a total of three hours per workday, but one hour at a time; and was unable to reach, handle, push, or pull with the right upper extremity; was able to occasionally finger and feel with the right upper extremity; was able to frequently push and pull with the left upper extremity, with otherwise unlimited function in the left upper extremity; was able to frequently operate foot controls with the right lower extremity; was unable to climb ladders or scaffolds, crouch, or crawl; was unable to engage in more than occasional climbing of ramps and stairs, balancing, stooping, or kneeling; was unable to tolerate exposure to unprotected heights or moving mechanical parts; was able operate motor vehicles only occasionally; and was able to tolerate no more than occasional exposure

29

AO 72A
(Rev.8/8
2)

to humidity, wetness, pulmonary irritants, temperature extremes, or vibration, that person could not work in any occupation. [R157-58]. The VE also testified that a person of Plaintiff's age, education, and work experience, who was limited, as stated in Dr. Kolanu's opinion, to no more than frequent reaching or handling with the right upper extremity; no more than occasional fingering, feeling, pushing, or pulling with the right upper extremity; no limitation in the left upper extremity; no more than frequent operation of foot controls with the lower extremities; no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; and no more than frequent exposure to unprotected heights, moving mechanical parts, motor-vehicle operation, humidity, wetness, pulmonary irritants, temperature extremes, or vibration, the person could work as an information clerk (sedentary, semi-skilled), an insurance clerk (sedentary, semi-skilled), or a surveillance-system monitor (sedentary, unskilled), and the only unskilled job the person could perform was that of a surveillance-system monitor. [R158-59]. The VE further testified that if an individual had the same physical limitations as the second hypothetical, but, as set forth by consultative psychologist Dr. Allsopp, for fifty percent of the day, the person was unable to interact with supervisors or coworkers,

respond appropriately to routine changes in the workplace, or handle workplace stressors, there would be no jobs that could be performed. [R160].

Subsequent to receiving the CDI report, the ALJ propounded interrogatories to a different VE. [R490-93]. When asked about the working capabilities of a person of Plaintiff's age, education, and experience, who could perform work at the medium exertional level, who could only occasionally stoop, kneel, crouch, or crawl; could perform simple tasks and make simple decisions; would be unable to work in very close proximity to others; could sustain attention for performance of simple tasks for up to two hours at a time; could interact with the public no more than occasionally; could maintain basic social interactions; could tolerate social interaction that is merely incidental to the work being performed; would be unable to tolerate a fast-paced work environment; and could tolerate infrequent changes that are gradually introduced, the VE responded with six different jobs: hand packager (medium), machine packager (medium), laundry sorter (light), mail sorter (light), addressing clerk (sedentary), and final assembler (sedentary). [R491-92].

## V.     ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.  The claimant has not engaged in substantial gainful activity since August 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: depression/major depressive disorder and anxiety/agoraphobia (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), except the claimant is able to do no more than occasional stooping, kneeling, crouching, crawling. She is able to perform simple tasks; able to make simple decisions; able to sustain attention for performance of simple tasks for up to two hours at a time; able to interact with the public no more than occasionally; able to maintain basic social interactions; able to tolerate infrequent changes that are gradually introduced. However, she is unable to

AO 72A
(Rev.8/8
2)

work in very close proximity to others and unable to tolerate a fast-paced work environment.

. . .

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.    The claimant was born on March 22, 1973 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11.   The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R103-19].

AO 72A
(Rev.8/8
2)

The ALJ explained, among other things, that based on VE interrogatory responses containing testimony stating that a person of Plaintiff's age, education, and experience, with the above-stated RFC could work as a hand packager (medium), machine packager (medium), laundry sorter (light), mail sorter (light), addressing clerk (sedentary), and final assembler (sedentary), he found that Plaintiff could perform work occurring in substantial numbers in the national economy. [R118-19].

## VI.    CLAIMS OF ERROR

Plaintiff first argues that the ALJ erred in discrediting the medical opinions of record in favor of the lay opinion of the GBI agent and that the decision therefore is not based upon substantial evidence. [Doc. 9 at 13-18]. Specifically, she contends that the ALJ abused his discretion by ordering the CDI; that because the record contains no evidence regarding the GBI agent's medical training, the CDI report cannot be credited over a medical opinion; that the ALJ did not supply good cause for giving Dr. Ahmed's treating opinion less than substantial or considerable weight; that the ALJ erred by discounting the opinion of examining neurologist Dr. Kolanu and reviewing neurologist Dr. DeVere that Plaintiff was limited to sedentary work with limitations of use of her dominant right hand; and that there is no substantial evidence to support the ALJ's determination that Plaintiff is capable of performing the reduced scope of medium work

AO 72A
(Rev.8/8
2)

set forth in the RFC.[20]  [*Id*.].  Second, Plaintiff contends that "fast-paced production" is insufficiently defined and that the ALJ therefore posed an incomplete hypothetical to the VE.  [*Id*. at 18-19].  The Court addresses the arguments in their logical order.

### A.    *CDI Report*

After careful evaluation of Plaintiff's arguments regarding the CDI report, the Court finds no reversible error in the ALJ's decision to order the report or in his consideration of the contents of the report.  As to the ALJ's decision to order the report, Plaintiff concedes that an ALJ has discretion to order a CDI to prevent fraud.  [Doc. 9 at 13].  She argues, however, that in this case, the ALJ ordered the CDI merely because he was unhappy with the various medical opinions, all of which, Plaintiff argues, showed that she was unable to work:  she argues that because the consultative examinations with Dr. Allsopp and Dr. Cain were scheduled in early July, [citing R993,

---

[20]    To the extent that Plaintiff's briefs could be read to contend that the ALJ otherwise erred in his weighing of the consultative psychologists and the psychological medical expert, the Court finds that the issue is, at best, perfunctorily addressed, as Plaintiff has failed to identify any error in the ALJ's evaluation of any particular opinion, other than the issue of the CDI report.  [*See* Doc. 9 at 13-18].  "Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived."  *N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). *Accord Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (holding that a claim was waived where its proponent did not elaborate on the claim or provide a citation to authority about the claim).

AO 72A
(Rev.8/8
2)

997], and the neurological consultative examination with Dr. Kolanu was not scheduled until August 20, 2014, [R1010], "it is apparent that the ALJ was not happy with the results of the first two examinations, so he ordered a third"; when the neurological consultation with Dr. Kolanu was also favorable to Plaintiff, the ALJ sought the opinion of reviewing physician Dr. DeVere, [*see* R1010-22]; and when all of the opinions of the medical experts or consultative examiners, including Dr. DeVere's opinion, would lead to a finding of "no jobs," the ALJ commissioned the CDI to use as a basis to deny Plaintiff's claims, [citing R157-60]. [Doc. 9 at 13-14]. She further contends that the medical opinions were generally consistent with one another and that none of the medical experts expressed an opinion that Plaintiff was uncooperative, malingering, or otherwise suspect, and that ordering the CDI was therefore inappropriate. [Doc. 9 at 13-14].

Plaintiff does not acknowledge, however, that the ALJ stated in the decision that he ordered the CDI in this case "based on the Agency's mandate to report suspected fraud so that it may be investigated." [R101]. The ALJ then went on to specify that Plaintiff's testimony and presentation at both hearings raised questions as to her veracity, as she was "attractively styled and very neatly dressed," but presented as though she was extremely groggy, unable to stay awake, unable to pay attention to the

36

proceedings, and unable to listen to or promptly respond to simple questions; that her conduct at the hearing contrasted with most of the treatment record, which mostly reflected normal mood, affect, and behavior and a relatively modest and consistent course of treatment; and that her conduct at the hearing and the impression of incapacity she promoted were not consistent with her ability to operate a motor vehicle, manage a home, and handle family finances. [R115-16]. He also noted that Plaintiff had a record of conviction for check-related fraud, [R117], and that her presentation at consultative examinations and some treatment visits had been questionable, [R117; *see* R108 (noting that Plaintiff's use of a neck brace, knee brace, and sling at the consultative examination prevented Dr. Cain from testing range of motion); R109 (noting that Dr. Kolanu had difficulty measuring weakness due to Plaintiff's complaints of post-stroke pain, that Dr. Kolanu observed that pain is not a common symptom after a stroke, and that Dr. Kolanu noted that from what could be measured, Plaintiff had normal sensation and no significant weakness); R109 (noting that Dr. DeVere reiterated that there was no neurological disorder or reason for weakness); R112 (noting that Plaintiff reported forgetfulness to Dr. Echols, but Dr. Echols found Plaintiff's memory to be intact on examination); R113 (referencing Dr. Ahmed's opinion that Plaintiff was magnifying her symptoms and catastrophizing)].

These issues certainly provide substantial evidence to support the ALJ's decision to order the CDI under the Agency's mandate to report fraud, and Plaintiff has not argued that any of the findings underpinning the ALJ's decision to order the CDI are without support in the record or that there was any legal bar to the ALJ's consideration of the evidence. Consequently, the undersigned finds that the ALJ did not err in ordering the CDI.

Likewise, contrary to Plaintiff's representations, the Court finds nothing in the ALJ's decision to indicate that he discredited any of the medical opinions in favor of medical opinions provided by Agent Spurlock. Notably, Plaintiff does not point to any medical opinion stated in the CDI report, [*see* Doc. 9 at 17], and the Court's own review of the CDI report reveals only one medical opinion, that Plaintiff "did not appear to be or act as if she was depressed or anxious," [R1190], which the ALJ implicitly discredited in finding that depression/major depressive disorder and anxiety/agoraphobia are among Plaintiff's severe impairments, [*see* R103; *see also* R116 ("Indeed, the claimant does have depression and anxiety, although they are often effectively managed by medication.")]. Rather, the ALJ's decision shows that he compared the investigator's lay observations to Plaintiff's claims of limitation: *e.g.*, Plaintiff's claims of social isolation compared to the CDI report's description of

38

her friendliness, her familiarity with neighbors, and her many Facebook friends, [R105, 115, 117]; Plaintiff's claims of disorientation and memory loss compared to the CDI report's description of her demonstrated knowledge of neighbors and local streets, ability to use a cell phone, and her alertness to her grandson's need to take a certain schoolbook with him, [R105, 112-13, 115]; and Plaintiff's claims of almost complete inability to use her right upper extremity compared to the CDI report's description of her ability to shop and carry purchases without assistance and use of both hands to access and type information into Facebook on a cell phone, [R115-17]. An ALJ is certainly permitted to consider statements from non-medical sources along with the rest of the record to help evaluate the credibility of a claimant's allegations of limitation. *See* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . ."); Social Security Ruling ("SSR") 06-3p, 2006 WL 2329939 at *3-4 (explaining that the regulations require consideration of evidence from non-medical sources, "which tend[s] to support or

contradict a medical opinion").[21]  For these reasons, the Court finds no call for reversal in Plaintiff's arguments regarding the CDI report.

### B.    Opinion of Dr. Ahmed

The Court turns next to Plaintiff's argument that the ALJ erred by assigning "less" weight to the treating opinion of Dr. Ahmed.   [Doc. 9 at 15-17].   The Commissioner evaluates every medical opinion the agency receives, regardless of the source.    20  C.F.R.  §§  404.1527(c),  416.927(c);  *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case.").   Thus, both examining and non-examining sources provide opinion evidence for the ALJ to consider in rendering a decision.   20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). In determining the weight of medical opinions, the ALJ must consider:

---

[21]      Although the cited versions of 20 C.F.R. §§ 404.1529 and 416.929—as well as 20 C.F.R. §§ 404.1502, 404.1527, 416.902, and 416.927—have been superceded and SSR 06-3p, as well as SSR 96-2p, have been rescinded, they remain applicable to cases filed prior to March 27, 2017.  20 C.F.R. §§ 404.1502, 404.1527, 404.1529, 416.902, 416.927, 416.929 (2017); *Corr. Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p*, 2017 WL 3928297 (Apr. 6, 2017); *Not. of Rescission of Soc. Sec. Rulings, 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (Mar. 27, 2017).

AO 72A
(Rev.8/8
2)

(1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," such that the reviewing court may determine "whether the ultimate decision on the merits is rational and supported by substantial evidence." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (punctuation omitted). Moreover, where an ALJ gives the opinion of a treating physician less than substantial or controlling weight, he must clearly articulate reasons establishing good cause for doing so. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 63 (11th Cir. Feb. 16, 2010) (citing *Lewis*, 125 F.3d at 1440)); SSR 96-2p, 1996 WL 374188. Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*,

357 F.3d 1232, 1241 (11th Cir. 2004). The good cause required before the treating physicians' opinions may be accorded little weight is not provided by the report of a non-examining physician where it contradicts the report of the treating physician. *Johns v. Bowen*, 821 F.2d 551, 554 (11th Cir. 1987). " 'The opinions of non-examining, reviewing physicians, . . . when contrary to those of examining physicians are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence.' " *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (quoting *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987)) (ellipses in *Lamb*). *Accord Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) ("[R]eports of physicians who do not examine the claimant, taken alone, do not constitute evidence on which to base an administrative decision."); *Strickland v. Harris*, 615 F.2d 1103, 1109 (5th Cir. 1980) ("[R]eports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision.") (quotation marks omitted). Failure to articulate the reasons for giving less than substantial or controlling weight to the opinion of a treating physician is reversible error. *Lewis*, 125 F.3d at 1440.

Plaintiff argues that the ALJ should have assigned controlling or substantial weight to Dr. Ahmed's opinion. [Doc. 9 at 15-17]. She points out that Dr. Ahmed

AO 72A
(Rev.8/8
2)

treated Plaintiff for several years prior to rendering his opinion, and she contends that she was "invariably depressed and anxious" at each visit. [*Id*. at 15 (citing [R1183-85])]. Plaintiff also appears to suggest that Dr. Ahmed's opinion was bolstered by Dr. Allsopp's examining opinion and that Dr. Allsopp's opinion was itself made stronger by Dr. Allsopp's having taken Dr. Echols's opinion into account. [Doc. 9 at 15]. She additionally points out that Dr. Allsopp found Plaintiff to be a cooperative, alert, and reliable informant, [*id*. at 15 (referencing [R983, 985])], and she avers that consultative psychological examiners Dr. Rush and Dr. Echols found Plaintiff to have borderline IQ, major depression, and anxiety, and that their opinions were therefore consistent with Dr. Ahmed's, [Doc. 9 at 15 (citing [R1044, 1050])]. Plaintiff also contends that because there is no indication in the record what medical training the GBI agent has, his opinion cannot constitute "good cause" for discrediting Dr. Ahmed's opinion. [Doc. 9 at 17]. Finally, she argues that the agency physicians are highly trained physicians chosen by the Social Security Administration for their reliability, expertise, and knowledge of Agency disability evaluation criteria, and none of them found Plaintiff to be "faking it." [*Id*. at 17-18 (citing [R985, 1044, 1051])].

It is true that the evidence Plaintiff cites could have constituted substantial evidence to support a decision by the ALJ to assign Dr. Ahmed's opinion controlling

AO 72A
(Rev.8/8
2)

or substantial weight. However, the standard for the Court is not whether the evidence in the record could support Plaintiff's interpretation of the facts or even the Court's interpretation, but instead, whether, after application of the proper legal standards and resolution of the crucial issues, substantial evidence supports the *Commissioner's* findings. *Mitchell v, Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Dyer*, 395 F.3d at 1210; *see* 42 U.S.C. § 405(g).

Plaintiff has not persuaded the Court that the ALJ reversibly erred in his consideration of Dr. Ahmed's opinion. First, as discussed above, the ALJ explained in the decision that he indeed found certain medical and lay evidence to indicate that Plaintiff may not have been entirely truthful in her statements and presentation. *See supra* Part VI.A. Second, as also discussed above, the Court finds nothing in the decision to indicate that the ALJ adopted a medical opinion from the CDI report. *See id.* Third, the ALJ also explained that he gave less weight to Dr. Ahmed's opinion because he found it inconsistent with many of Dr. Ahmed's own treatment notes and with the observations of other treating physicians: notes from Plaintiff's October 2012 visit with her primary care physician, where she reported that she was doing better with her depression and anxiety and was observed to have normal mood and affect, full orientation, and normal memory, judgment, and insight, [R673, 675]; January 2014

44

notes from Piedmont Hospital indicating that Plaintiff denied anxiety or difficulty concentrating and that she was found to have a normal mood and appropriate affect, with normal speech, logical thought, and intact reasoning, [R898-99]; notes from a May 2014 visit with Plaintiff's primary care physician, where she stated that she had not taken medication for anxiety for one month, yet she had no psychiatric complaints during a review of systems, and an examination indicated normal mood and affect and intact memory, [R989-91]; September 2014 notes from Piedmont Hospital indicating that Plaintiff's mood, memory, and judgment were observed to be normal, [R1098]; April 2015 notes from Atlanta Heart Associates indicating that Plaintiff's mood, memory, and judgment were normal, [R1113]; and notes from a July 2015 visit with Plaintiff's primary care physician, where she was found to have normal mood and affect with intact memory, judgment, and insight, [R1215]. [R114-15]. Additionally, he explained that although there were some occasions when Dr. Ahmed observed poor concentration, the occasions were limited compared to Plaintiff's usual presentation. [R115]. The ALJ also noted that Plaintiff often went for significant periods without treatment and that her status without medication was not substantially worse than when she received effective medication. [R115; *see also* R815-26, 1101-11].

45

Other than her challenges to the CDI report, which, as discussed above, the Court does not find persuasive, Plaintiff does not contend that the ALJ's reliance on any of these facts in discounting Dr. Ahmed's opinion constituted legal or factual error. [*See* Doc. 9 at 13-18]. Thus, given the ALJ's robust explanation of his reasons for assigning "less" weight to the opinion of Dr. Ahmed, Plaintiff has not persuaded the Court that the ALJ erred in his evaluation of the opinion.

### C.    Fast-Paced Production Work

Plaintiff also argues that the ALJ's determination that there are other jobs Plaintiff could perform is not supported by substantial evidence because the ALJ did not define "fast-paced work environment" when he posed his hypothetical questions in interrogatories presented to the VE. [Doc. 9 at 18-19]. She contends that "[i]t seems apparent" that the employer would set the production pace for the packaging, sorting, and assembling jobs the VE named, depending upon the economy, the demand for the product, and perhaps the season of the year, and that one could not count upon a slow pace. [*Id*. at 18]. She also points to a Seventh Circuit opinion, *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015), wherein the court stated that "[w]ithout . . . a definition [of "fast paced production"], it would have been impossible for the VE to assess whether a person with [the claimant's] limitations could maintain the pace

AO 72A
(Rev.8/8
2)

proposed," [Doc. 9 at 19], and she further suggests that avoiding "fast-paced production" may be an accommodation and not the way the jobs are performed in the national economy, [*id.* (citing 20 C.F.R. § 404.1573(c)(5))].

For a number of reasons, the Court does not find the argument persuasive. First, *Varga*, as a decision of the Seventh Circuit, is not binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) ("Under the established federal legal system the decisions of one circuit are not binding on other circuits.").

Second, Plaintiff appears to interpret *Varga* as having held that "fast-paced production" must always be further defined in order for a VE to assess whether a person with the claimant's limitations could maintain the pace proposed. [*See* Doc. 9 at 19]. The Court does not agree. In *Varga*, the ALJ found that the claimant had moderate limitations in concentration, persistence, or pace and in various functional areas within that category, but the ALJ adopted an RFC and posed a hypothetical question to the VE that did not include those limitations and instead only limited the claimant to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements." *Varga*, 794 F.3d at 814. Here, in contrast, Plaintiff does not point to any limitations in the concentration, persistence, or pace

47

category that the ALJ adopted but did not include in the RFC or the hypothetical question posed to the VE. [Doc. 9 at 18-19]. Accordingly, even if *Varga* were binding upon courts in this Circuit, it does not speak to the issue Plaintiff raises here.

Plaintiff's reliance on 20 C.F.R. § 404.1573(c)(5) is also misplaced, as the regulation does not pertain to determining a claimant's vocational capabilities but rather provides guidance on determining whether the claimant has participated in substantial gainful activity, another issue that is not implicated here. Moreover, as the Commissioner points out, the regulations permit the Commissioner to rely on a VE for the VE's knowledge and expertise. *Bryant v. Comm'r of Soc. Sec.*, 451 Fed. Appx. 838, 839 (11th Cir. Jan. 4, 2012) (explaining that "[t]he Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE to produce detailed reports or statistics in support of her testimony"); *Curcio v. Comm'r of Soc. Sec.*, 386 Fed. Appx. 924, 926 (11th Cir. July 15, 2010) (rejecting a challenge to the jobs identified where the claimant's attorney stipulated to the VE's qualifications, did not object to VE testimony about the jobs the claimant could perform, and offered no evidence to controvert the VE testimony); *see also* 20 C.F.R. §§ 404.1566(e), 416.966(e) ("If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used,

AO 72A
(Rev.8/8
2)

or there is a similarly complex issue, we may use the services of a vocational expert or other specialist."). *Cf.* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("A vocational expert or specialist . . . "may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work . . . ."); *Leonard v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 298, 301 (11th Cir. Jan. 19, 2011) (finding no error where VE based testimony on knowledge gained from personal experience).

Plaintiff does not argue that her attorney objected to the VE's qualifications or the interrogatory responses regarding the jobs a person with the stated RFC could perform, and she does not proffer any evidence to controvert the VE testimony. [Doc. 9 at 18-19]. The Court therefore finds nothing in Plaintiff's argument upon which to base a conclusion that the VE's interrogatory response, [R492], was insufficient to support the ALJ's finding that a person unable to tolerate a fact-paced work environment would nevertheless be capable of working in the packaging, sorting, and assembling occupations relied upon in the decision.

AO 72A
(Rev.8/8
2)

### D. Physical RFC

Plaintiff also summarily contends that the ALJ's determination that Plaintiff is capable of performing medium work is not supported by substantial evidence and that the ALJ erred by failing to credit examining neurologist Dr. Kolanu and reviewing neurologist Dr. DeVere's opinions that Plaintiff was limited to sedentary work with limitations of use of her dominant right hand. [Doc. 9 at 13-14 & n.12; Doc. 11 at 1-2]. Like Plaintiff, the Court is mystified as to the ALJ's basis for determining that Plaintiff is capable of medium work, which, as Plaintiff points out, requires lifting of up to fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. §§ 404.1567(a), 416.967(a). Plaintiff concedes, however, that both Dr. Kolanu and Dr. DeVere opined that Plaintiff was capable of performing sedentary work with limitations in the use of her right hand. [Doc. 9 at 13-14]. Two sedentary jobs—addressing clerk and final assembler—were among the representative occupations supplied by the VE, [R492], and relied upon by the ALJ in finding that Plaintiff was capable of working, [R118]. Plaintiff has not argued that the sedentary jobs the VE listed were too limited in number to serve as representative occupations available in significant numbers in the national economy. [*See generally* Docs. 9, 11]. Thus, the Court finds no basis for determining that the ALJ's finding regarding

AO 72A
(Rev.8/8
2)

Plaintiff's exertional capabilities constituted reversible error. *See Shinseki v. Sanders*, 556 U.S. 396, 406, 410 (2009) (holding that upon review of ordinary administrative proceedings, the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination); *Doughty*, 245 F.3d at 1278 n. 2 (noting that it is the claimant's burden to prove that she is unable to perform the jobs that the Commissioner lists); *Columbus v. Colvin*, Civ. Action File No. 1:13-CV-04266-AJB, 2015 WL 5311080, at *11 (N.D. Ga. Sept. 11, 2015) (Baverman, M.J.) (finding no reversible error where the plaintiff had not argued that the additional limitations she advocated would have prevented her from performing occupations relied upon by the ALJ); *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, at *4 (M.D. Fla. Sept. 29, 2010) (noting that, in general, an error is harmless in a Social Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits").

The Court also is not persuaded that the ALJ reversibly erred in his consideration of the neurologists' opinions regarding limitations in Plaintiff's ability to use her right hand. Both Dr. Kolanu and Dr. DeVere opined that Plaintiff was limited to only occasionally lifting and carrying up to ten pounds, [R1011-12, 1033-35], which is inherently accommodated by an occupation classified at the sedentary level,

51

AO 72A
(Rev.8/8
2)

20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."). And while it is true that Dr. Kolanu further limited Plaintiff to only occasionally using her right hand for fingering, feeling, pushing, or pulling, and frequently using it for reaching and handling, [R1013], and Dr. DeVere stated, based on Plaintiff's claims of chronic arm pain and her use of a sling, that she could never use her right hand for reaching, handling, pushing, or pulling and could only occasionally use it for fingering and feeling, [R1035], the opinions of non-treating sources are not due the deference or consideration given to a treating source, and there is no articulation requirement for evaluating non-treating opinions that is comparable to the articulation requirement for evaluating treating-source medical opinions. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2), (e), 416.902, 416.927(c)(2), (e); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (explaining that opinions of one-time examiners are not entitled to deference); *Sharfarz*, 825 F.2d at 280 (explaining that opinions of nonexamining, reviewing physicians are not entitled to deference). Instead, the ALJ must consider factors bolstering or cutting against the opinion, including factors such as whether evidence supports the opinion and the opinion's consistency with the record as a whole, *see* 20 C.F.R. § 404.1527(c), 404.1529(c)(4), 416.927(c),

52

416.929(c)(4), SSR 06-3p, 2006 WL 2329939 at *3-4, and the ALJ "may reject any medical opinion if the evidence supports a contrary finding," *Sharfarz*, 825 F.2d at 280. Here, the ALJ discussed reasons for discounting the opinions of right-arm limitations: imaging of Plaintiff's neck and right wrist showed minimal degenerative changes, [R107-08, 110-11, 572-73]; in August 2012, Plaintiff denied arthritic symptoms and had normal muscle strength and tone, [R111, 794, 796]; in January 2014, Plaintiff denied joint pain, loss of strength, or fatigue, and physical examination revealed normal range of motion in the neck, [R111, 898]; Dr. Kolanu's examination revealed normal sensation and no significant weakness, and Dr. Kolanu noted that Plaintiff's claims of pain following a stroke were atypical and that her claims of pain made it difficult to assess her claims of weakness, [R109, 1010-22]; in September 2014, a review of systems reflected no numbness or weakness, and physical examination revealed normal strength, [R111, 1097-98]; in November 2014, there was normal range of motion, no tenderness in the musculoskeletal system, and Plaintiff reported no fatigue, [R111, 1071-72]; Dr. DeVere found no neurological disorder and no reason for the claimed weakness, and he based the right-arm limitations on Plaintiff's claims of pain and use of a sling, [R109, 1028-38]; a January 2015 visit to Piedmont Hospital's emergency department with claims of moderate right-arm pain showed intact strength

AO 72A
(Rev.8/8
2)

and no edema, [R109, 1065]; at an examination taking place in April 2015, Plaintiff had

normal muscle strength and tone, no motor or sensory deficit, and no edema, [R111,

1113]; in July 2015, Plaintiff was observed to have no decreased range of motion,

atrophy, or sensation deficit in her musculoskeletal system, [R111, 1215]; her

medication for pain was limited and, when prescribed, was generally mild, [R111];

more intensive treatment was not indicated, [R111]; Plaintiff admitted to being able to

prepare simple meals, shop, and do laundry, [R111, 431-42]; the medical evidence of

record did not support Plaintiff's claim of having been advised to have a rod inserted

into her right arm and have neck surgery, [R111]; the opinions of Plaintiff's physical

limitations were based on limited examinations when she acted in a manner different

than on most typical occasions, [R111]; Plaintiff had a propensity to magnify her

symptoms, [R111, 113]; and lay observations that Plaintiff shopped without special

help, did not need assistance carrying purchases, "acted like any other customer," and

used both hands to access and type information into Facebook on her cell phone

suggested that she retained good use of both hands, which "contrast[ed] sharply" with

Plaintiff's claims and her presentation at her consultative examinations, [R115-17].

The Court finds that these reasons constitute substantial evidence for rejecting the

nonexertional right-arm limitations imposed by consultative neurologist Dr. Kolanu and

54

AO 72A
(Rev.8/8
2)

reviewing neurologist Dr. DeVere. Moreover, Plaintiff has not argued that the claimed limitations, even if fully credited, would prevent her from performing the sedentary occupations relied upon by the ALJ, [*see generally* Docs. 9, 11], and thus has waived the issue, *see Doughty*, 245 F.3d at 1278 n.2 (providing that, to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists); *see also Outlaw*, 197 Fed. Appx. at 827 n.3 (holding that a claim was waived where its proponent did not supply an argument); *Jones v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 767, 770 (11th Cir. May 12, 2006) (holding that only the arguments asserted before the district court were preserved for appeal) (citing *Jones*, 190 F.3d at 1228).

## VII.   CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.   The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED**, this the 10th day of September, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)